**DEBRA P., et al., Plaintiffs,**

v.

**Ralph D. TURLINGTON, et al., Defendants.**

**No. 78–892–Civ–T–GC.**

United States District Court,
M.D. Florida,
Tampa Division.

May 4, 1983.

---

Stephen F. Hanlon, Tampa, Fla., Diana Pullin, Richard Jefferson, Roger Rice, Cambridge, Mass., for plaintiffs.

William Dorsey, Judith A. Brechner, Tallahassee, Fla., for defendants.

## MEMORANDUM OPINION AND ORDER

### GEORGE C. CARR, District Judge.

In 1978, the Florida Legislature approved an amendment to the Educational Accountability Act of 1976, Fla.Stat. § 229.55 et seq., which required public school students in the State of Florida to pass a functional literacy examination in order to receive a state high school diploma. Fla.Stat. § 232.-246(1)(b). Shortly after its enactment, Florida high school students filed a class action challenging the constitutionality of the literacy test requirement.[1] This Court found that the test violated both the equal protection and due process clauses of the

Constitution and enjoined its use as a diploma sanction until the 1982–83 school year. *Debra P. v. Turlington,* 474 F.Supp. 244 (M.D.Fla.1979). On appeal, the Fifth Circuit Court of Appeals affirmed many of this Court's findings. *Debra P. v. Turlington,* 644 F.2d 397 (5th Cir.1981). However, the appellate court remanded the case for further factual findings on two key issues. Specifically, this Court was directed to make further findings on whether or not the functional literacy test, the Florida Student State Assessment Test, Part II (SSAT–II), covers material actually taught in Florida's classrooms. 644 F.2d at 406. In addition, the Court of Appeals requested this Court to reexamine the "role and effect of the 'vestiges' of past discrimination" upon twelfth grade black students. 644 F.2d at 408 n. 19.[2]

Following receipt of the mandate from the Court of Appeals,[3] this Court held a series of status conferences aimed at determining the most effective way to comply with the appellate court's directives. It was decided that the issues could best be resolved separately. Thus, trial of the first issue—the question of instructional validity—was scheduled for the week of February 28, 1983. An evidentiary hearing on the vestige question was held during the week of April 25, 1983.

### I. *The Instructional Validity Issue*

The SSAT–II is a test of a student's ability to successfully apply basic communications and mathematics skills to everyday life situations. *See* Fla.Stat. § 232.-246(1)(b); Fla.Admin.Code Rule 6A–1.-942(2)(a). The test covers 24 basic skills. Of these, 11 are designated as communica-

---

1. For an outline of the history of this litigation as well as a more detailed summary of the plaintiffs' claims and the defendants' defenses, *see Debra P. v. Turlington,* 644 F.2d 397, 400–02 (5th Cir.1981).

2. Class B was certified as "all present and future twelfth grade black public school students in the State of Florida who have failed or who hereafter fail the SSAT–II." 474 F.Supp.

at 246. Class C was certified as "all present and future twelfth grade black public school students in Hillsborough County who have failed or who hereafter fail the SSAT–II." *Id.*

3. The Court of Appeals denied a petition for rehearing and petition for rehearing en banc. *Debra P. v. Turlington,* 654 F.2d 1079 (5th Cir. 1981).

tions skills and 13 are designated as mathematics skills.[4] *Defendants' Exs.* 77 & 78.

As of October, 1982, 3809 members or 2.77% of the Class of 1983 had not yet passed the mathematics portion of the SSAT–II; 301 or .16 of 1% had not yet passed the communications test. *Defendants' Ex.* 106. If these students do not pass the examination which was given in April of 1983, and this Court does not continue the injunction, they will receive a certificate of completion rather than a diploma when they graduate.

The Court of Appeals has upheld the denial of a diploma to these students so long as the "test is a fair test of that which was taught." 644 F.2d at 406. The Court reasoned that "[i]f the test is not fair, it cannot be said to be rationally related to a state interest" and therefore it would be violative of the Equal Protection Clause. *Id.* In other words, the SSAT–II is only constitutional if it is instructionally valid.

Before determining whether or not the SSAT–II is instructionally valid, it is necessary to define the term and to determine the scope of the appeals court's mandate with regard to this issue. Although professional educators might dispute its meaning, the parties generally agreed that the term, as used by the Court of Appeals, can be summarized in just one question.[5] Put simply, the task assigned to this Court by the Court of Appeals was to find out if Florida is teaching what it is testing. Unfortunately, the answer to this apparently easy question is quite complex.

In an effort to carry its burden of proving that the test is instructionally valid, the defendants commissioned IOX Assessment Associates, a private consultant firm, to develop a study design. IOX designed a study which consisted of four separate compo-

nents. First, IOX devised a teacher survey which was sent to every teacher in Florida. The survey asked teachers whether they had provided instruction relating to the 24 skills tested on the SSAT–II. If they had, the teachers were then asked if they had provided sufficient instruction for a student to master the skills. The teachers were required to answer separately for each individual skill. In addition, although the survey was anonymous, the teachers were asked to identify whether they were an elementary or secondary teacher and, if a secondary teacher, they were to identify their major field of emphasis.

The second part of the study designed by IOX was a survey sent to the 67 school districts and 4 university laboratory schools in Florida.[6] The districts were required to fill out a set of six forms. The forms were titled:

I. SSAT–II Skills by Grade Summary

II. Major SSAT–II Instructional Program Variations

III. Description of SSAT–II Remedial Programs

IV. Summary of SSAT–II Staff Development Activities

V. Instructional Materials Analysis for SSAT–II Skills

VI. Additional SSAT–II District Activities

The Skills by Grade Summary asked the districts to estimate at what grade students received preparation in the various SSAT–II skills and when the majority of students would have attained mastery of these skills. Form II asked the districts to report any major instructional variations among the schools in the district. Form III, the Remedial Program Form, asked the districts to describe any remedial programs specifically

---

4. The communications skills are: main idea, details, cause/effect, fact/opinion, unstated opinion, references, index, maps, letters, checks, and forms. *Defendants' Exs.* 77 and 78. The mathematics skills are: elapsed time, monetary amounts, whole numbers, decimals/percents, comparison shopping, interest, sales tax, discounts, linear measurement, area, capacity, weight, and graphs/tables. *Id. See* Fla.Admin.Code Rule 6A–1.942(3)(a), (b).

5. Although the parties have agreed that the concept described by the Court of Appeals is that of instructional validity, it should be noted that the Court actually referred to this term as "curricular validity." 644 F.2d at 405.

6. For the purposes of this opinion, references to the individual school districts should be read as including the individual laboratory schools.

related to attaining mastery of the SSAT–II skills. Form IV required the district to identify and describe any staff development activities conducted by the district to promote mastery of SSAT–II skills. In response to Form V the districts were required to list instructional materials that specifically prepared students for any of the SSAT–II skills. The final form, Form VI, asked the districts to identify any programs directed specifically toward helping students pass the SSAT–II.

The third component of the IOX study consisted of a series of site visits to verify the accuracy of the district reports. The site visit teams were comprised of one employee of the Florida Department of Education and two educators from the districts. At least one site visit team visited each district. The site visitors spent two days in each district interviewing administrators and teachers and comparing the instructional materials used in the district with those listed in the district report. At the conclusion of their visit, the site visitors prepared a report of their findings and impressions about the accuracy of the district report.

The fourth component of the IOX study was a student survey administered by the site visitors to one or two eleventh grade social studies and english classes. The survey asked the students to state whether or not they had been taught in school how to answer the types of questions found on the SSAT–II. The sample questions provided to the students included questions on all 24 SSAT–II skills.

At trial, the defendant offered three expert witnesses who opined, based on the array of data outlined above, that Florida was teaching what it was testing. Specifically, Dr. W. James Popham, the President of IOX and the person primarily responsible for the IOX study design, testified that the results of the study convinced him that the SSAT–II was instructionally valid. After explaining how the study was developed and detailing how it had been modified to insure accuracy, Dr. Popham stated that it is clear that the school districts in Florida are adequately preparing their students for the test. In large part, Dr. Popham found support for his opinion in the results of the Mastery Exposure Index prepared by the Department of Education. The Index, which was prepared at Dr. Popham's suggestion, attempts to distill the statistics adduced from the teacher survey. In essence, it shows how many opportunities a Florida public school student is given to attain mastery of the various SSAT–II skills. The end result of this statistical analysis is that students are given an average of 2.7 opportunities to attain mastery of the SSAT–II skills. According to Dr. Popham, a student need only be exposed once to mastery level instruction for the test to be instructionally valid. As a result, 2.7 exposures were more than sufficient to insure the fairness of the test and the attendant diploma sanction.

The State also called Dr. Donald Henderson as an expert witness. Dr. Henderson accompanied one of the site visit teams on their audit of the Pinellas School District. Dr. Henderson generally described his visit and offered his opinion, based on the survey results and on what he had observed, that the test was instructionally valid. Dr. Henderson also described in detail the efforts being undertaken by the State to monitor remediation throughout the districts. Dr. Henderson explained that the principals of every school were sent questionnaires concerning students who had failed the SSAT–II. The principals were required to describe the steps taken to remediate these students. Follow-up questionnaires were sent to gain more information on the students who were reported as not receiving remediation. The follow-up results showed to Dr. Henderson's satisfaction that steps had been taken to guarantee that any student who wanted remediation was receiving it.

The defendant's final witness was Dr. Robert Gagne. Dr. Gagne also accompanied a site visit team during one of its audits. In addition, Dr. Gagne testified that he had examined the results of all four parts of the IOX study and that, in his professional opinion, he was convinced that the SSAT–II was instructionally valid. Dr.

Gagne also opined that students who flunked the SSAT–II in the tenth grade could learn the necessary skills prior to graduation provided they received suitable instruction. Moreover, he found evidence that suitable instruction was being offered.

The plaintiffs attempted to controvert the defendants' case through the testimony of two experts, Dr. Robert Linn and Dr. Robert Calfee. Dr. Linn testified that instructional validity requires a sufficient degree of preparation and that some students may need more than one exposure to mastery in order for the test to be fair. Dr. Linn also suggested that the survey conducted by the State was not a reliable indicator of what actually went on in the classrooms. In particular, he noted that the survey only covered the 1981–82 school year rather than a twelfth grader's entire school career. In addition, Dr. Linn indicated that the survey was constructed in such a way as to invite positive responses from the teachers and that the survey responses should have been checked by visits to actual classrooms in which SSAT–II skills were taught.

Dr. Calfee studied the teacher responses from all the districts and concluded that the teacher responses were related to the performance of students on the test. Thus, teachers in districts in which students did poorly on the test generally reported that they were not teaching as many SSAT–II skills as their counterparts in high success districts. In particular, Dr. Calfee found a wide variation in the responses of teachers who stated that they taught math skills. Dr. Calfee noted that this disparity in teacher responses was in line with students' actual performance on the test since students were having a much harder time with the math skills on the test than with the english skills.

 In addition to presenting these experts, the plaintiffs argued that the Court should not receive the survey results offered by the defendants since they were inadmissible hearsay. The defendants argued that the survey results should be allowed in under Fed.R.Evid. 803(8)(C) or under the residual exception to the hearsay rule, Fed.R.Evid. 803(24). After hearing argument by the parties, the Court ultimately ruled that the survey results were admissible under Fed.R.Evid. 803(24). In the alternative, they were admitted under Fed.R.Evid. 703 as being the basis of the expert opinions presented at trial.[7]

---

7. The landmark case dealing with the admissibility of surveys and polls is *Zippo Manufacturing v. Rogers Imports,* 216 F.Supp. 670 (S.D.N.Y.1963). *Zippo* was a trademark infringement case in which the trial judge allowed the introduction of a consumer study which attempted to show consumer confusion. The Court reasoned that the hearsay rule should not bar the admission of properly conducted surveys, and held that surveys should be allowed if there is a "circumstantial guaranty of trustworthiness" surrounding the making of the out of court statement.

The *Zippo* decision is in line with the recommendation of the Judicial Conference Study Group which issued a *Handbook of Recommended Procedures for the Trial of Protracted Cases,* 25 F.R.D. 351, 425 (1960). In the *Handbook,* the Panel recognizes the need for both polls and surveys in certain types of cases. Although the Panel acknowledged that polls which are offered to prove the truth of the matters asserted by the interviewees are hearsay, it suggested that they should be admissible in certain circumstances.

The Panel went on to advise that a poll's admissibility should depend on the type of methodology used. If it was a proper scientific poll, it should be allowed. Factors which cut against admissibility, according to the Panel, would be a close nexus between the attorneys and the interviewers or knowledge by the interviewers and interviewees of the purpose of the poll.

Because the Panel's *Handbook* and the *Zippo* decision were issued before the codification of the Evidence Code, they do not directly discuss the applicability of Rule 803(24). More recent authority has directly addressed this issue. For example, in *Pittsburgh Press Club v. United States,* 579 F.2d 751, 757–60 (3d Cir.1978), the Court did hold that survey results are admissible under Rule 803(24). Based on the facts of that case, however, the Court found that the survey results were inadmissible because they were not sufficiently trustworthy. Like *Pittsburgh Press Club,* the interviewees in this case were aware of the purpose of the poll. Yet, unlike *Pittsburgh Press Club,* the pollsters in this case have attempted to put in safeguards to assure the poll's trustworthiness. Indeed, the plaintiffs' expert, Dr. Calfee, admitted that he had no problem with the survey procedures used by the defendants. Moreover, even if the survey results were not admissible under Rule

As the foregoing outline of the evidence suggests, the resolution of the instructional validity issue depends both on whose experts are believed and on what sort of proof is required. With regard to the former, it is important to understand that the instructional validity issue, and the related concept of minimum competency testing, are relatively new and highly controversial subjects which seem to have polarized the educational community.[8] Thus, in large part, this Court has been called upon to settle not only a legal argument but also a professional dispute. At times, the distinction between these two spheres has blurred. The experts for both sides spoke in terms of "fairness", "adequacy" and "sufficiency." Yet, these terms are not necessarily synonymous with constitutionality. As noted in a law review article cited frequently by the appellate court, any judicial decision on this issue "will reflect only the minimum standards essential to fairness under our legal system. Policymakers must meet, but are not limited to, the minimum standards in pursuing the goal of educational equity for students." M.S. McClung, Competency Testing Programs: Legal and Educational Issues, 47 *Fordham L.Rev.* 651, 712 (1979).[9] In other words, even though the defendants might have implemented a much more equitable program, their actions might still pass constitutional muster.

But, what does the Constitution require in this instance? It may not be fair to expect students with differing interests and abilities to learn the same material at the same rate, but is it unconstitutional? Similarly, it may be inequitable that some students, through random selection, are assigned to mediocre teachers while others are given excellent instructors, but does this inequity rise to the level of a constitutional violation?[10]

■ These questions lead to other issues concerning the appropriate burden of proof. The plaintiffs argue that the defendants have not carried their burden because they have not attempted to follow students throughout their entire careers. They also assert that there is insufficient evidence of what actually goes on in the classrooms.[11]

---

803(24), this Court has wide discretion under Rule 703 to allow an expert to explain the basis of his opinion. *Baumholser v. Amax Coal Company,* 630 F.2d 550, 552–53 (7th Cir.1980). Since all of the defendants' experts testified that they had relied on the survey data, and the plaintiffs were given a substantial opportunity to cross-examine the experts on the study's reliability and to present their own expert opinions of the data, admission of the raw data was not prejudicial to the plaintiffs. *Id.* at 553. Finally, the Court carefully considered the plaintiffs' arguments in deciding what weight, if any, should be given to the survey results.

8. For example, the National Institute of Education sponsored a symposium on the pros and cons of minimum competency testing in 1980. The plaintiffs' two experts as well as plaintiffs' lead counsel participated in the symposium and represented the opposition faction. Dr. Popham, the defendants' key witness and the person responsible for designing the state's survey, was the leader of the group who favored the testing.

9. It is interesting to note that Mr. McClung was an attorney at the Center for Law and Education when he authored this article and that Diana Pullin assisted him in the preparation of the section on instructional validity. The Center for Law and Education has represented the plaintiffs throughout this litigation and Ms. Pullin, who is one of its attorneys, has acted as lead counsel.

10. In *Plaintiffs' Proposed Findings of Fact* at ¶ 48, the plaintiffs suggest that the disparity in teachers' abilities should be taken into account.

11. One of the plaintiffs' principal attacks on the defendants' evidence concerns the appropriate burden of proof. Citing *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the plaintiffs argue that the defendants have the burden of proving by clear and convincing evidence, rather than by a preponderance, that the SSAT–II is instructionally valid. Although the plaintiffs have cited a number of cases in which a more rigorous standard of proof is appropriate, they have not shown why proof of a preponderance of the evidence would be improper on the instant facts.

> Because proof by a preponderance of the evidence requires that 'the litigants . . . share the risk of error in a roughly equal fashion.' . . . it rationally should be applied only when the interests are of roughly equal societal importance.

*Santosky v. Kramer,* 455 U.S. 745, 787, 102 S.Ct. 1388, 1411, 71 L.Ed.2d 599 (1982) (Rehnquist, J., dissenting) (citations omitted).

But, absent viewing a videotape of every student's school career, how can we know what really happened to each child? Even assuming that such videotapes were available, how could this Court decide, in constitutional terms, which students received appropriate instruction and which did not? Suppose that there is one student who never encountered a teacher who taught the SSAT–II skills, or a teacher who taught the skills well, should the entire test be declared invalid? What if the number of students were 3,000 rather than 1?[12]

It is necessary to consider these questions in order to appreciate the dilemma confronted by this Court. Instructional validity is an elusive concept. Moreover, unlike some of the other claims made by the plaintiffs at the first trial, the instructional validity issue strikes at the heart of the learning and teaching process. It also lends itself to individualized determinations rather than objective treatment.

Instructional validity is a subpart of content validity which together with curricular validity, insures that a test covers matters actually taught. As the Court of Appeals noted, and as this Court previously found, the SSAT–II is a "good test of what the students *should* know." 644 F.2d at 405 n. 11. That is, the subjects tested parallel the curricular goals of the State.[13] To this end, the Department of Education publishes minimum performance standards and also "periodically examine[s] and evaluate[s] procedures, records, and programs in each district to determine compliance with law and rules established by the state board." Fla.Stat. § 229.565(2). Thus, although the individual districts are still somewhat autonomous, they no longer have the authority to decide that they will not teach certain minimum skills.[14] See Fla.Stat. § 230.-23(4)(f)(1); § 230.23(7)(a); § 230.33(9)(a). In the same vein, the Department of Education, the individual districts, and the separate schools are required to submit annual reports of how well school instructional programs are helping students acquire minimum performance skills. In sum, since at least 1979, school administrators and teachers have been well aware of the minimum performance standards imposed by the State and their duty to teach these skills.

In addition, the districts now have access to state-approved instructional materials; materials which have been screened by the state instructional materials council in an effort to determine the degree to which they "implement the curricular objectives of the schools of the state." Fla.Stat. § 233.09(4). The districts are also required to use their annual allocation of state funds for the purchase of books from the state-approved list.[15] Fla.Stat. § 233.34(2).

While the plaintiffs' property interests in obtaining their diplomas are of great importance, these interests are roughly equal in societal importance to the State's interest in insuring quality public education for all Florida students. *See* Fla.Stat. § 229.55(2)(a). It follows that the defendants should not be required to carry a heightened burden of proof in this case. *Accord, San Antonio School District v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973); 644 F.2d at 402–03.

12. The Court recognizes that the plaintiffs would answer this question affirmatively. *Plaintiffs' Proposed Conclusions of Law* at ¶ 25 and ¶ 26.

13. The plaintiffs correctly point out that the State has not listed the SSAT–II skills in Chapter 233 as a mandatory course of study. The minimum student performance standards, however, were distributed to the individual schools as early as 1978. *Defendants' Exs.* 1a–72a.

14. Passing the SSAT–II is not the only graduation requirement mandated by the Educational Accountability Act. Students must also demonstrate mastery of the minimum performance standards which are approved by the State Board of Education in reading, writing, and mathematics for the eleventh grade (the SSAT–I), and they must complete a minimum number of academic credits. Fla.Stat. § 232.246(1)(a), (c). Although the emphasis of the programs is different, many of the skills learned in fulfilling one requirement aid in satisfying another requirement. For example, a basic knowledge of reading is required to pass both the SSAT–I and the SSAT–II. As a result, the overall statutory scheme outlined above is directed towards satisfying all three graduation requirements.

15. Up to 50 percent of the annual allocation may be used for books not on the list or for the repair and renovation of textbooks and library materials. Fla.Stat. § 233.34(2).

The districts also receive funding from the State to remediate students who need special educational assistance in order to master the basic skills. Fla.Stat. § 236.088. Evidence was presented at trial which demonstrated that the State has kept track of these students and has monitored the efforts being taken to remediate them. *Defendants' Ex.* 74. Each district school board is also required to establish pupil progression plans to insure that students are not promoted without consideration of each student's mastery of basic skills. Fla. Stat. § 232.245. The State has also established uniform testing standards for grades 3, 5, 8 and 11 to monitor the acquisition of basic skills by students statewide. *Id.*

These legislative requirements bolster the conclusion that the SSAT–II is, at least, curricularly valid. They lend support to the opinions of the defendants' experts that the SSAT–II is instructionally valid. It is clear from the survey results that the terms of the Educational Accountability Act are not just hollow words found in a statute book. Rather, the district reports, teacher surveys, and site visit audits, as interpreted by the defendants' experts, all indicate that the directives of the Act are a driving force in all of Florida's public schools.

Nevertheless, it is the plaintiffs' position that the instructional validity of the test can not be established by showing that the skills tested are included in a recognized curriculum. To the contrary, they believe that the only touchstone of the test's validity is proof of what graduating seniors were *actually,* not theoretically, taught. Without such proof, the plaintiffs posit that no one can tell whether the students had a "fair" opportunity to learn.

The plaintiffs are particularly concerned that the districts are not offering uniform preparation on the SSAT–II skills. Indeed, the plaintiffs' expert, Dr. Calfee, demon-

strated that the degree of preparation on SSAT–II skills varied significantly from district to district. The defendants have not suggested that preparation is identical in all the districts. To the contrary, the defendants' expert, Dr. Popham, admitted that no two students will have exactly the same academic experience and that every student will encounter poor teachers and poor administrators during his or her school career. *E.g., Popham* at 66, 347. Nevertheless, despite the disparity among districts, the defendants' experts still believed that students in *all* of Florida's districts were given an adequate opportunity to learn the SSAT–II skills before the end of twelfth grade.

As noted above, it is impossible to prove conclusively the degree to which every one of the more than 100,000 graduating seniors were exposed to the SSAT–II skills. What is known, is that the districts have reported that these skills are included in their curriculum and that a substantial number of public school teachers have stated that they adhere to this curriculum by including these skills in their course of instruction. In addition, and of even greater significance in determining the constitutionality of the test, it is known that students are given five chances to pass the SSAT–II between the tenth and twelfth grades of school and that, if they fail, they are offered remedial help. They also have the option of staying in school for an additional year in order to "receive special instruction designed to remedy [their] identified deficiencies." Fla.Stat. § 232.246(4).[16] Certainly, some remedial programs and teachers will be more effective than others. However, this disparity cannot be said to be unfair in a constitutional sense. While it might be preferable from an educator's standpoint to insure that students learn the requisite skills during their regular courses

---

**16.** A student who has not passed the SSAT–II may stay in school for the extra year on either a full-time or part-time basis. Fla.Stat. § 232.-246(4). In addition, a student who has received a certificate of completion rather than a diploma may take adult education courses aimed at remediating SSAT–II skills. Fla.Stat. § 228.-

072. A student who has received a certificate of completion rather than a diploma may also take the SSAT–II after leaving school even though he or she is not enrolled in an adult education course. Fla.Admin.Code Rule 6A–1.-942(2)(b)(2).

rather than in remedial sessions, the Constitution clearly does not mandate such a result. What is required is that the skills' be included in the official curriculum and that the majority of the teachers recognize them as being something they should teach.[17] Once these basic facts are proven, as they have been in this case, the only logical inference is that the teachers are doing the job they are paid to do and are teaching these skills. *Accord, Anderson v. Banks,* 540 F.Supp. 761 (S.D.Ga.1982). It strains credibility to hypothesize that teachers, especially remedial teachers, are uniformly avoiding their responsibilities at the expense of their pupils.

The Court of Appeals held that the State has the right to impose the diploma sanction provided the test covers what is taught. 644 F.2d at 406. If the burden asserted by the plaintiffs were accepted, the State would never be able to exercise that right because instructional validity could never be proven as to every student.[18] Such a result is not mandated either by the Constitution or the Court of Appeals. To the contrary, the appellate court cautioned against,

> imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions.

644 F.2d at 406, *quoting San Antonio School District v. Rodriguez,* 411 U.S. 1, 43, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16 (1972).

■ For the reasons stated above, and based on a review of the evidence presented by both sides, the Court finds that the defendants have carried their burden of proving by a preponderance of the evidence that the SSAT–II is instructionally valid and therefore constitutional. Although the instruction offered in all the classrooms of all the districts might not be ideal, students are nevertheless afforded an adequate opportunity to learn the skills tested on the SSAT–II before it is used as a diploma sanction.

## II. *The Vestiges Issue*

As noted earlier, deciding that the SSAT–II is a fair test of that which is taught in the Florida public schools does not end this Court's inquiry. The Court must still decide whether or not the State should be enjoined from imposing the diploma sanction because the vestiges of past purposeful discrimination have an unconstitutional impact on black high school students.

No one disputes the fact that the SSAT–II failure rate among black students is disproportionately high. Of the three thousand twelfth grade students who have not passed the test, about 57% are black even though blacks only constitute about 20% of the entire student body. While these statistics are alarming, they do not, standing alone, answer the constitutional question this Court must confront.

■ In order for this Court to continue to prohibit the State from using the SSAT–II as a diploma sanction, the disproportionate failure rate among today's high school seniors must be found to have been caused by past purposeful segregation or its lingering effects. If the disparate failure of blacks is not due to the present effects of past intentional segregation or if the test is necessary to remedy those effects, then the

17. The conclusion that the proper focus is on whether the skills are included within the curriculum and not on whether each student had identical educational experiences, is supported by the language used by the appellate court in announcing its holding. The Court wrote, "if the test is found to be invalid for the reason that it *tests matters outside the curriculum,* its continued use would violate the Equal Protection Clause." 644 F.2d at 406 (emphasis added).

18. Significantly, several of the plaintiffs' own witnesses at the first trial suggested that their concerns about the instructional validity of the test could be resolved within a few years. *E.g.,* Dr. Madaus at 1780–83; Dr. Tyler at 2118, 2120, 2141–42. *See Final Argument of Mr. Rice* at 3281.

four year injunction entered in 1979 can not be extended. 644 F.2d at 407.

The Court has already found that the vestiges of past purposeful segregation did exist in the Florida public schools from 1971 to 1979. 474 F.Supp. at 252. At the more recent trial, the plaintiffs presented evidence which indicates that black students are still being suspended more often than white students, that several counties still do not have black administrators, that racial stereotypes still persist, and that blacks are being assigned to EMR classes more readily than whites.

In addition, the plaintiffs' expert, Dr. Roderick McDavis, testified that the racial bias of teachers is a significant problem within the Florida public schools. Dr. McDavis, an expert in the counseling of ethnic minorities who has held workshops in a number of Florida's school districts, related that students and counselors often reported to him that teachers called black students derogatory names and had low expectations for them. The plaintiffs' second expert, Dr. Na'im Akbar, a clinical psychologist, stated that racial animus among teachers and the lack of black administrators in the schools would detrimentally affect the ability of black students to learn by eroding their "self-concept." In other words, if black students feel that they are in an alien environment and are exposed to negative experiences in school, their academic motivation will be diminished. Consequently, minority students might never acquire the basic skills necessary to master more difficult academic tasks.

The testimony offered by Drs. Akbar and McDavis reinforced the testimony which Dr. Gordon Foster offered at the first trial and convinces the Court that the vestiges of past purposeful segregation continue, to some extent, until the present day. The Court does not find, however, that the problems related by the plaintiffs' experts are as widespread as they contend. While it seems clear that some individual teachers, both black and white, carry with them biases which impair their teaching abilities, the Court rejects Dr. McDavis' estimate that as many as 30% of the teachers in Florida's public schools are overtly or covertly racist. Similarly, the evidence belies Dr. Akbar's conclusions concerning the causative effect of the problems he identified.[19] For example, the record reveals that more than 90% of the black students in Florida's schools have successfully taken the test and that black students in counties where there are black administrators have not done appreciably better on the SSAT–II than black students in counties where there are no black authority figures. As a result, the Court reaffirms its finding that the vestigial problems outlined earlier "do not constitute the denial of an equal educational opportunity . . . ." 474 F.Supp. at 252.

The mere fact that black students are not doing as well as white students on the test does not direct a different result. As Dr. Akbar pointed out, many of the impediments to learning faced by black students do not have their source in the classroom. To the contrary, according to Dr. Akbar, black students also experience significant difficulties because they are growing up in a predominantly white society. Unfortunately, no matter how much all of us might wish it, these problems are not going to go away today, tomorrow, or even by the end of the decade. Indeed, as long as past purposeful segregation remains part of our collective memory, its vestiges will, sadly, remain with us, not only in our schools, but in every aspect of our lives.[20]

█ Relying on *Gatson County v. United States,* 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969), the plaintiffs seem to argue that the SSAT–II will be invalid as long as any vestiges of discrimination exist.

---

19. The value of the plaintiffs' expert testimony is undercut by the fact that it is not based on reliable scientific data. Instead, as the defendants have argued, the experts' conclusions were largely based on anecdotal reports rather than on empirical studies.

20. Implicit in this Court's 1979 Opinion was the finding that the vestiges of past purposeful segregation have continued to dissipate over time.

Indeed, they have suggested that the test is unfair because the black parents of this year's graduating class received an inferior education and therefore have a more limited ability to help their children succeed in school. While there may well be some factual validity to the plaintiffs' argument, it does not follow that the test should be enjoined until every vestige of past discrimination, no matter how faint, is erased. The Supreme Court's decision in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), is instructive. The Court wrote,

> We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with the myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds.... The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage.

402 U.S. at 22–23, 91 S.Ct. at 1267.

■ The same limits apply in the present case. Thus, it must be remembered that the SSAT–II is constitutionally impermissible only if the disproportionate failure rate among black students is due to the learning deficits created by the past segregation of the Florida public schools or its effects. For the following reasons, the Court finds that there is no causal link between the disproportionate failure rate and the present effects of past school segregation. Moreover, even if there was a causal connection, the defendants have carried their burden of showing that the SSAT–II is necessary to remedy those effects.

The State's principal witness on the vestiges issue was Dr. Barbara Lerner. Dr. Lerner was an extraordinary witness. Although the Court does not accept all of her opinions, her testimony on the key issues in this case was highly persuasive. In sum, it was Dr. Lerner's position that the vestiges of school segregation do not affect a student's academic achievement. In particular, she did not believe that the lack of role models or the presence of racial stereotypes were responsible for the disparate performance of blacks on the SSAT–II. Instead, she testified that the empirical data demonstrated that other factors such as the educational background of a student's parents, the class size, and the amount of homework required were more directly related to student achievement.

Dr. Lerner's testimony concerning the necessity of the SSAT–II to remedy the effects of past segregation was even more significant. According to Dr. Lerner, children need a "climate of order" to be able to learn. Pointing to studies which demonstrate that Catholic school youngsters, regardless of their race or religion, do better than their public school peers on standardized tests, Dr. Lerner opined that the learning process of all students is aided by clear demands, fair testing and appropriate sanctions. She stated without equivocation that the SSAT–II program, with its standardized goals and diploma sanction, met these criteria. She stated further that the test was necessary to overcome whatever effects of past purposeful segregation remain in the schools. By enacting the SSAT–II, the State set equal goals for all children and told students, teachers, and administrators that sanctions would be imposed if these goals were not met. In Dr. Lerner's opinion, knowledge of these goals and sanctions would add to a student's motivation and his or her ability to succeed academically.

The injunction entered in 1979 was premised on the finding that it would be unconstitutional to deny a diploma to a student who did not have an opportunity to gain an equal education. In particular, the Court was concerned about imposing the diploma sanction on students who had attended schools which did not have the same textbooks, curricula, libraries and attendance requirements. 474 F.Supp. at 250. The Court found further that "punishing the victims of past discrimination for deficits created by an inferior educational environment neither constitutes a remedy nor

creates better educational opportunities." 474 F.Supp. at 257.

In the 1979 trial, this Court found, "the most significant burden which accompanied black children into the integrated schools was the existence of years of inferior education." 474 F.Supp. at 252. This burden is not shouldered by the Class of 1983. Unlike the Class of 1979, black and white members of the Class of 1983 have had the same textbooks, curricula, libraries and attendance requirements throughout their public school years. Thus, while no two students can have an identical academic experience, their educational opportunities have nonetheless been equal in a constitutional sense. Moreover, to the extent that insidious racism is a problem in the schools, it would seem that a test like the SSAT–II, with objective standards and goals, would lead to its eradication.[21] Testimony of Dr. Lerner; *Defendants' Ex.* 114 (Deposition of Herb A. Sang).

Twelve years have passed since the Florida public schools became physically unitary. Since that time, the State of Florida has undertaken massive efforts to improve the education of all of its school children. The SSAT–II is an important part of those efforts. Its use can be enjoined only if it perpetuates the effects of past school segregation or if it is not needed to remedy those effects. 644 F.2d at 397. *Castaneda v. Pickard,* 648 F.2d 989, 996–97 (5th Cir.1981). Applying this standard to the facts presented at both the 1979 and 1983 trials, the Court finds that the injunction should not be extended. The State of Florida may deny diplomas to the members of the Class of 1983 who have not passed the SSAT–II.

---

**21.** This finding also resolves the question of whether or not the defendants, have violated the EOAA, 20 U.S.C. § 1703. The Act is not violated, even if the vestiges of past purposeful

segregation still exist, so long as the defendants have taken "affirmative steps" to remove the vestiges. The SSAT–II, as presently implemented, is such an "affirmative step."