**Chris P. CARTER, individually and on behalf of all others similarly situated, Plaintiff-Appellee,**

**Troy Scheffler, Steven A. Glaviano, Richard Jordan, Interested Parties-Appellants,**

v.

**FORJAS TAURUS, S.A., Taurus International Manufacturing Inc., Taurus Holdings Inc., Defendants-Appellees**

No. 16-15277
Non-Argument Calendar

United States Court of Appeals, Eleventh Circuit.

(June 29, 2017)

760

Tillman J. Breckenridge, Bailey Glasser LLP, Washington, DC, David L. Selby, II, Bailey & Glasser, LLP, Michael Todd Wheeles, Morris Haynes Wheeles Knowles & Nelson, Birmingham, AL, John William Barrett, Bailey & Glasser, LLP, Charleston, WV, for Plaintiff-Appellee

Stephen D'Oench Field, Stephen D. Field, PA, Hialeah, FL, for Richard Jordan and Troy Scheffler

Steven A. Glaviano, Pro Se

Timothy Bumann, John Weeks, John Robert Autry, Kristen Wenger Bracken, David Alan Mobley, Smith Gambrell & Russell, LLP, Atlanta, GA, Kristen Wenger Bracken, John P. Marino, Smith Gambrell & Russell, LLP, Jacksonville, FL, for Defendants-Appellees

Before HULL, WILSON, and MARTIN, Circuit Judges.

PER CURIAM:

Troy Scheffler, Richard Jordan, and Steven Glaviano are unnamed class members challenging the district court's approval of a class-action settlement and attorney's fee award.[1] The settlement is the result of a class action suit filed by Chris Carter against Forjas Taurus, S.A., Taurus International Manufacturing, Inc., and Taurus Holdings Inc. (collectively, "Taurus"), alleging that nine Taurus gun models had certain safety defects. After litigation and mediation, Carter reached a settlement with Taurus on behalf of the class. Scheffler, Jordan, and Glaviano opposed the settlement, but the district court dismissed their objections and approved it. Each of them appeals. After careful review, we affirm the district court.

### I.

#### A. BACKGROUND

In 2013, Carter was a deputy with the Scott County, Iowa Sheriff's Department. He owned a Taurus PT140 Millennium PRO pistol. While making an arrest, Carter's gun fell from its holster at his waist and fired when it hit the ground. Fortunately no one was hurt. Carter says the manual safety was engaged when his gun fell, and it was still engaged when he retrieved it from the ground. When engaged, the manual safety is supposed to prevent the gun from firing.

Carter then brought this suit against Taurus on behalf of himself and a nationwide class of people who own certain Taurus gun models (the "class guns"). In the amended complaint, Carter alleged his gun and other similar models contained two defects: First, he alleged the class guns could fire even with the manual safety engaged (the "false safety defect"). This could happen if the manual safety was switched on while the trigger was "not in its fully forward position." Second, he alleged the guns could fire when dropped (the "drop-fire defect") because they lacked a "trigger blade safety." Carter sued Taurus for (1) violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201; (2) negligence; (3) strict liability; (4) breach of express warranties; (5) breach of the implied warranty of merchantability; (6) violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; (7) negligent failure to warn, as well as concealment and misrepresentation; and (8) fraudulent concealment and intentional failure to warn.

At first, the parties aggressively litigated the suit. Forjas Taurus resisted service of the complaint, as well as later document-production requests, on the basis of its Brazilian citizenship. Taurus also moved to dismiss Carter's amended complaint.[2] The parties then engaged in significant discovery. Carter hired experts who performed 500 hours of testing on Taurus guns. He represented that the experts performed over 300 drop tests on class guns and compared the results with tests on new Taurus guns made with trigger blade safeties.[3]

During discovery, the parties also spent over 90 hours in mediation and settlement negotiations. At mediation, Carter shared his experts' test results. Taurus then hired their own experts to examine those results. Eventually, the parties agreed to a settlement.

---

1. Glaviano is proceeding <u>pro se</u>.

2. Taurus withdrew its motion to dismiss after Carter responded to it. Then the three defendants separately answered the complaint.

3. The parties also represented that in 2013, Taurus stopped making the class guns and began making different gun models that had trigger blade safeties.

## B. SETTLEMENT AGREEMENT

The settlement agreement covers a nationwide class of gun owners of one or more of the class guns. Under the settlement, all class members can choose to turn in their class guns and receive one of two benefits: (1) a cash payment of as much as $200, with Taurus's total payment for this benefit capped at $30 million; or (2) an enhanced warranty, under which owners can exchange their guns for a similar new model that includes a trigger blade safety. Class members will be able to choose the cash option only during a four-month claims period, but the enhanced warranty option is available to any current or future owner of a class gun for the life of the gun. Finally, subject to court approval, Taurus agreed to pay up to $9 million in attorney's fees and expenses, as well as a $15,000 incentive award to Carter for representing the class. The parties have since agreed to modify the attorney's fee award to $8.3 million.

## C. SETTLEMENT APPROVAL

On June 23, 2015, the district court held a preliminary approval hearing. At the hearing, Taurus admitted the class guns all lack a trigger blade safety. After the hearing, the district court preliminarily approved the settlement and class notice; preliminarily certified the settlement class; and preliminarily appointed the class representative, class counsel, and claims administrator. To preliminarily certify the class, the court found (again, preliminarily) the class met the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3). The court also set deadlines for class members to opt out of the settlement or object to it, and scheduled the final approval hearing.

Before the final approval hearing, Carter submitted an expert affidavit from Dr. Andrew Safir, who has a doctorate in economics with a specialty in econometrics. The Safir affidavit estimated the value of the proposed settlement. According to Dr. Safir, if all class members participated, the settlement would be worth $239.1 million. But assuming a claim rate of 10 to 25 percent, Dr. Safir calculated a total settlement value of $29.9 million to $73.6 million. To calculate the value of the enhanced warranty, Dr. Safir looked at online gun auctions to estimate the prices of used class guns [4] and the Taurus website for the list price of new replacement guns. He determined there was an average value of $235 per replaced gun. Using this average value plus shipping fees, Dr. Safir calculated the enhanced warranty was worth between $20.9 million and $52.3 million. For the cash option, Dr. Safir determined that claimants would receive between $158 and $170 per gun, depending on the total number of claims. He estimated the value of the cash option to be between $9 million and $21.3 million. Finally, Dr. Safir added the estimated value ranges of the two options to calculate the total settlement value.

Also before the final hearing about the settlement, Carter submitted deposition testimony from Taurus's Chief Customer Service Representative that under the original Taurus warranty, Taurus did not replace a gun because of the drop-fire defect. Scheffler, Jordan, and Glaviano all filed objections to the proposed settlement. The district court held the final approval hearing on January 20, 2016, but because of concerns raised by the objectors, the court delayed final approval and ordered

4. The parties agreed that most of the class guns were made between 1997 and the mid-2000s.

that a supplemental notice be sent to the class.

The district court continued the settlement approval hearing on July 18, 2016. At this hearing, Taurus acknowledged the manual safeties on the class guns could be placed in the false safety position, but attributed this to user error. In addition, Glaviano presented his objections at the end of the hearing.[5]

On August 3, 2016, the district court approved the settlement and attorney's fees, and overruled the objections. Scheffler, Jordan, and Glaviano appeal the district court's order.

## II.

As an initial matter we must decide whether Scheffler, Jordan, and Glaviano, who are neither named class representatives nor intervenors, have the power to bring this appeal. The general rule is "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." Marino v. Ortiz, 484 U.S. 301, 304, 108 S.Ct. 586, 587, 98 L.Ed.2d 629 (1988) (per curiam). But in Devlin v. Scardelletti, 536 U.S. 1, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002), the Supreme Court held "that nonnamed class members ... who have objected in a timely manner to approval of the settlement at the fairness hearing have the power to bring an appeal without first intervening." Id. at 14, 122 S.Ct. at 2013.

■ Despite differences between Devlin and this case, we will apply Devlin's rule to Scheffler, Jordan, and Glaviano. The objector in Devlin was part of a mandatory class with no opt-out rights certified under Rule 23(b)(1). See id. at 5, 10–11, 122 S.Ct. at

2008, 2011. The Supreme Court recognized that because the objector "had no ability to opt out of the settlement," appealing the settlement was his "only means of protecting himself from being bound by" its terms. Id. at 10–11, 122 S.Ct. at 2011. Here in contrast, the class was certified under Rule 23(b)(3). That means Scheffler, Jordan, and Glaviano could have opted out of the class. See Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 617, 117 S.Ct. 2231, 2246, 138 L.Ed.2d 689 (1997). Nevertheless, persuasive authority convinces us to apply Devlin's rule here. That is because "Devlin is about party status and one who could cease to be a party is still a party until opting out." Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582 F.3d 30, 40 (1st Cir. 2009); accord Poertner v. Gillette Co., 618 Fed.Appx. 624, 627–28 (11th Cir. 2015) (per curiam) (unpublished); Fidel v. Farley, 534 F.3d 508, 512–13 (6th Cir. 2008); Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 572 (9th Cir. 2004); In re Integra Realty Res., Inc., 354 F.3d 1246, 1257 (10th Cir. 2004). Therefore, Scheffler, Jordan, and Glaviano, as objecting class members who did not opt out of the settlement, may bring this appeal.

## III.

We thus turn to the merits of the appeal. We review de novo whether named plaintiffs have standing to assert their claims. Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1345 (11th Cir. 2001). We review the approval of a class action settlement for a clear showing of abuse of discretion. Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). "The proponents of class action settlements bear the

---

5. Before Glaviano spoke, the district court asked Taurus and Carter some questions to aid in writing a final order. The court said "that's why I'm using this hearing, to make

sure that as I've written out the order, I can make sure that I have the specifics in the order."

burden of developing a record demonstrating that the settlement distribution is fair, reasonable and adequate." Faught v. Am. Home Shield Corp., 668 F.3d 1233, 1239 (11th Cir. 2011) (quotation omitted and alteration adopted). We review for an abuse of discretion a district court's award of attorney's fees. Id. at 1242. "We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion." Knight through Kerr v. Miami-Dade Cty., 856 F.3d 795, 808 (11th Cir. 2017) (quotation omitted).

## A. STANDING

Before certifying the class, the district court was required to find that Carter had standing to raise each class claim. See Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000). "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Id. (quotation omitted). Among other things, Carter must allege he suffered an "injury in fact" in order to demonstrate standing. Resnick v. AvMed, Inc., 693 F.3d 1317, 1323 (11th Cir. 2012).

■ Glaviano challenges Carter's standing to be the class representative, suggesting that Carter did not suffer an actual injury. Glaviano says Carter's gun does not have the false safety defect. But Carter alleged he owned a class gun that suffered from the same defects as the rest of the class guns. Thus, Carter suffers from the same alleged injury as the rest of the class. See Bush, 221 F.3d at 1279. We discern no other standing defects.

## B. CLASS CERTIFICATION

■ Glaviano next objects to the district court's certification of the class. To certify a class under Rule 23(b)(3), a district court must find that issues common to the class "predominate" over issues specific to indi-

vidual class members. Fed. R. Civ. P. 23(b)(3). Glaviano argues the class does not meet this requirement because the class guns do not have any defects, and therefore all the issues are specific to Carter. But whether the class guns actually have the alleged defects is not relevant for the purposes of class certification. "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 133 S.Ct. 1184, 1191, 185 L.Ed.2d 308 (2013). As the district court found, Carter alleged the class guns suffer from common defects because they lack trigger blade safeties and can be placed in the false safety position. Thus, Glaviano's challenge fails because the factual issue he identifies concerns alleged defects common to all the class guns. See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1233–34 (11th Cir. 2000) (noting that "issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof" (quotation omitted)).

■ Glaviano also argues the district court erred in certifying the class because the court recognized that managing the nationwide class would be difficult. See Fed. R. Civ. P. 23(b)(3)(D). But the Supreme Court has told us when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems." Windsor, 521 U.S. at 620, 117 S.Ct. at 2248. Thus, the district court did not abuse its discretion in this regard when it certified the class.

## C. SETTLEMENT APPROVAL

■ Glaviano next challenges the fairness of the settlement. He argues Taurus

is no longer required to repair the class guns under the enhanced warranty and can instead replace the guns with inferior models. Glaviano also argues the cash option is unfair because Taurus can pay claimants half of what they originally paid for their guns.

A district court must find that a class action settlement "is fair, adequate and reasonable and is not the product of collusion between the parties." Bennett, 737 F.2d at 986 (quotation omitted); see Fed. R. Civ. P. 23(e)(2). The district court correctly found that Glaviano has no basis for his claim that his class gun is better than the new model. Indeed, Dr. Safir valued the class guns as worth an average of $235 less than the new models. The district court was also correct to reject Glaviano's objection that Taurus was using the settlement to avoid honoring the original warranty's promise to repair class guns. The court pointed to deposition testimony from Taurus's Chief Customer Service Representative that the alleged drop-fire defect would not have been covered under the original warranty. Neither did the district court err in rejecting Glaviano's claims that the cash payment is too low. The parties agreed that most class guns are over ten years old, so they should not be valued at their original selling price. And in any event, settlements are compromises, providing the class members with benefits but not full compensation. See Bennett, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."). It was reasonable

for the court to conclude that the settlement, which provided class members the benefit of a cash payment or a replacement gun in exchange for an allegedly defective and dangerous class gun, was "fair, adequate and reasonable." Id. (quotation omitted).

■ Scheffler and Jordan also argue the district court did not do enough to evaluate the settlement for collusion between class counsel and Taurus. Specifically, they argue that the "clear-sailing agreement"[6] in the settlement protected class counsel and reduced their incentive to get a better settlement for the class. They rely on a Ninth Circuit case noting that the combination of a clear-sailing agreement and a separate fund for attorney's fees can be a sign of collusion. See In re Bluetooth, 654 F.3d at 947. But these allegations of collusion are not supported by the record.

Instead, the record shows that the district court reviewed the settlement for collusion. In approving the settlement, the district court noted that the parties reached the settlement after arm's-length negotiations at six mediation sessions. And before that, the parties litigated for over a year, including 500 hours of expert testing, depositions, disputes about service and discovery, and motions practice. Therefore, despite the clear-sailing agreement, the district court did not err in this regard when it approved the settlement.[7]

## D. ATTORNEY'S FEES

■ Scheffler and Jordan challenge the district court's award of $8.3 million in

6. In a "clear sailing" agreement, "defendants agree[ ] not to object to an award of attorneys' fees." In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011).

7. We also reject Scheffler and Jordan's claim that the district court failed in its role as fiduciary to absent class members because the court said it was working on the final order during the July 2016 final approval hearing.

Before the July 2016 hearing, the district court had already held a final approval hearing in January. At that time, objectors voiced their concerns. Taking these concerns seriously, the court ordered a supplemental notice sent to the class and delayed final approval. The court also received the objectors' numerous written objections before the July final approval hearing. In addition, the court addressed these objections in its order approv-

attorney's fees. They say that while the class could receive as much as $30 million, it is likely to receive much less because Taurus will keep any unclaimed money. They argue the attorney's fee should have been calculated based on the amount actually paid to the class. But this is not required by our precedent.

"[N]o case has held that a district court must consider only the actual payout in determining attorneys' fees." Waters v. Int'l Precious Metals Corp., 190 F.3d 1291, 1295 (11th Cir. 1999). Instead, in this circuit we have identified twenty to thirty percent of the common fund as a "benchmark" for an attorney's fee award. Id. at 1294. The district court may also consider "the individual circumstances of each case using the factors set forth in" Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974), abrogated on other grounds Blanchard v. Bergeron, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).[8] Waters, 190 F.3d at 1294 (quotation omitted).

The district court's fee award is a reasonable percentage of the settlement value. Here, we have a $30 million fund for any claims made under the cash option, as well as the enhanced warranty, which is itself a significant tangible benefit. Combining both, Dr. Safir estimated the total settlement value to be worth over $239 million. Even if we ignore the enhanced warranty, the $8.3 million award is 27.7% of the $30 million fund, which falls within the benchmark range. See id.

In addition, the district court found the fee award reasonable under the factors set out in Johnson, 488 F.2d at 717–19. The

court found class counsel spent almost 8,100 hours on the case. And it found the settlement gave value to the class, as well as promoted public safety by removing allegedly defective weapons from the public. The court also noted class counsel's skill and experience in litigating class actions concerning gun manufacturing, and that class counsel took risks litigating against a foreign company and in the highly regulated field of guns. The district court "has great latitude in formulating attorney's fees awards subject only to the necessity of explaining its reasoning so that we can undertake our review." Waters, 190 F.3d at 1293 (quotation omitted). The district court fully explained its reasoning for adopting the fee award. It did not abuse its discretion in doing so. See Faught, 668 F.3d at 1242.

### E. OTHER OBJECTIONS

#### 1. Dr. Safir's Qualifications

Glaviano challenges Dr. Safir's qualifications as an expert and the reliability of his methodology. Specifically, Glaviano disputes Dr. Safir's expertise in valuing guns. He appears to argue Dr. Safir should have used the manufacturer's suggested retail price ("MSRP") for the used class guns, but should not have used the MSRP for the new replacement guns.

■ The district court did not err in relying on Dr. Safir's expert opinion. Dr. Safir, who has a doctorate in economics with a specialty in econometrics, explained his methodology for valuing the guns at issue. He looked at sale prices on gun auction websites to determine the value of the used class guns, and he used the listed MSRPs as the values of the new replace-

---

ing the settlement. It was well within the district court's discretion to bring a draft order to the final approval hearing, as well as to use that hearing to help draft the order.

8. In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

ment guns. Although Glaviano prefers his own valuations, the district court rejected them as based on unverified anonymous web postings. On this record, Glaviano has not shown that the district court abused its discretion in relying on Dr. Safir's expert opinion. See Knight, 856 F.3d at 808 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." (quotation omitted)); Debra P. by Irene P. v. Turlington, 730 F.2d 1405, 1412 (11th Cir. 1984) ("It is settled law that the weight to be accorded expert opinion is solely within the discretion of the judge sitting without a jury. . . ." (quotation omitted)).

### 2. Second Amendment

■ Finally, Glaviano raises a Second Amendment challenge to the settlement agreement. He says the settlement agreement violates the right of class members to "keep" their guns because it allows Taurus to confiscate any class guns returned for repairs. Glaviano points to no case, and this Court has found none, that says the Second Amendment protects against this kind of action. The Supreme Court has held "that the Second Amendment right is fully applicable to the States," McDonald v. City of Chicago, 561 U.S. 742, 750, 130 S.Ct. 3020, 3026, 177 L.Ed.2d 894 (2010), but has yet to extend this right to protect gun owners against the actions of gun manufacturers. Glaviano's Second Amendment challenge fails.

### IV.

We conclude the objectors' challenges to the class settlement and the attorney's fee award are without merit.

**AFFIRMED.**